# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

June 29, 2009

No. 06-20709

Charles R. Fulbruge III
Clerk

RANDALL S. YOUNG; THESSA G. YOUNG, Individually and as next friends of Ashton Young,

Plaintiffs–Appellants,

v.

MEMORIAL HERMANN HOSPITAL SYSTEM, doing business as Memorial Hermann Hospital; RURAL/METRO OF TEXAS LP; MEMORIAL HERMANN HEALTHCARE SYSTEM; R/M OF TEXAS GP INC.; RURAL/METRO OF TEXAS INC.; JOSE MEDINA, MD; KATRIN Y. TAKENAKA, MD; STACY MACDONALD, RN; ALIE RIEDLE, RN,

Defendants–Appellees.

Appeal from the United States District Court
for the Southern District of Texas

Before HIGGINBOTHAM, SMITH, and OWEN, Circuit Judges.

PER CURIAM:

Randall Young, his wife, and their minor child have asserted health care liability and derivative claims and appeal the district court's grant of summary judgment in favor of the defendants (collectively, Memorial) on the element of causation. We affirm.

## I

Thirty-seven-year-old Randall Young, a Louisiana resident, attended a motocross event at Reliant Stadium in Houston, and during that event bystanders found him wandering aimlessly near a concession stand. Paramedics responded to a call at 8:34 p.m. and transported Young to Memorial Hermann Hospital, where he arrived at 9:20 p.m. It was later determined from a friend who had entered Reliant stadium with Young but was not seated with him that the last time Young was seen symptom free was about 6:30 p.m. or perhaps 6:45 p.m. We will not detail the treatment Young received at Memorial or the results of various tests other than to note that a CT scan was initially "negative" for a stroke, but a subsequent CT scan was performed after 2:30 a.m., and Young was diagnosed with a stroke at 4:15 a.m.

Whether Memorial should or could have diagnosed Young's stroke earlier and the appropriate course of treatment are hotly disputed. One of the Young family's chief contentions is that Memorial should have immediately diagnosed the stroke and should have administered an intravenous tissue plasminogen activator, known as t-PA. In some cases t-PA can lyse or "bust" the clot that causes a stroke. The Youngs contend that if Randall Young had received this drug within three hours of the onset of symptoms, he would have fully or substantially recovered. It is undisputed that Young is severely and totally disabled as a result of his stroke.

The Youngs filed health care liability claims against Memorial Hermann Hospital and other defendants in the United States District Court for the Southern District of Texas, basing jurisdiction on diversity of citizenship. The Youngs relied on opinions from three experts to support the causation aspect of their claims. After these experts had submitted reports and were deposed, the Memorial defendants filed motions to exclude the experts' testimony on various grounds and filed a motion for summary judgment on the element of causation.

Ultimately, the district court granted Memorial's motion for summary judgment. The court concluded that there was insufficient evidence to raise a fact question as to whether Young would have suffered less severe impairment if t-PA had been administered.

The Youngs have appealed. We review the district court's grant of summary judgment de novo, applying the same standard that the district court applied.[1] Summary judgment is inappropriate if the record contains a genuine issue of material fact.[2]

## II

The parties agree that Texas substantive law governs. The Texas courts have held that plaintiffs in a medical malpractice or health care liability suit must show a "reasonable medical probability" that "their injuries were caused by the negligence of one or more defendants."[3] This "mean[s] simply that it is 'more likely than not' that the ultimate harm or condition resulted from such negligence."[4] The Supreme Court of Texas, like many courts, has equated the "more-likely-than-not" causation requirement to a more than 50% probability that a defendant's wrongful conduct caused the harm or injury.[5]

---

[1] *Caboni v. Gen. Motors Corp.*, 278 F.3d 448, 451 (5th Cir. 2002).

[2] *Id.*

[3] *Kramer v. Lewisville Mem'l Hosp.*, 858 S.W.2d 397, 399-400 (Tex. 1993).

[4] *Id.* at 400; *see also Providence Health Ctr. v. Dowell*, 262 S.W.3d 324, 328 (Tex. 2008) (explaining, when failure to render treatment was alleged, that under the more-likely-than-not standard, "the issue is whether [treatment] would have made [the death or injury] unlikely").

[5] *See Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 715-17 (Tex. 1997) (concluding in a products liability case involving administration of a drug alleged to cause birth defects that "the requirement of a more than 50% probability means that epidemiological evidence must show [at least] that the risk of an injury or condition in the exposed population was more than double the risk in the unexposed or control population," citing numerous decisions and Judge Weinstein's seminal decision in *In re "Agent Orange" Product Liability*

It is undisputed that there is reliable scientific evidence that timely administration of t-PA is beneficial to some patients, some patients do not benefit from t-PA therapy, and some stroke victims who do not receive t-PA recover, with little or no lasting impairment. We know that Randall Young was not treated with t-PA and that tragically, he did not recover significantly. Under Texas law, the Youngs must produce reliable evidence that it is more likely than not that Randall Young would have been among those patients who materially benefit from the administration of t-PA rather than among those who receive the therapy and do not benefit.[6]

The Youngs' best evidence lies in Table 3 of a 1997 "subgroup analysis" of an earlier, foundational 1995 study of t-PA's effectiveness.[7] Assuming, without deciding, that this subgroup analysis accurately reflects the effect of t-PA in the general population of patients, the relevant portion of this table suggests that in Young's age group and at his level of stroke severity, Young's likelihood of a very favorable outcome was approximately 42% even without t-PA treatment, while his likelihood of success with the treatment was approximately 59%.

But as we have recognized, the law of Texas establishes the standard of causation as "more-likely-than-not," which means that it is more probable, i.e. more than 50% likely, that the alleged wrongful conduct caused the injury than not. The requirement that the wrongful conduct more likely than not caused the injury is the foundation for the conclusion in Bendectin litigation in Texas and

*Litigation*, 611 F. Supp. 1223, 1262 (E.D.N.Y. 1985), in which he held that the plaintiffs were required to offer evidence that causation was "'more than 50 percent probable'").

[6] *See Providence Health Ctr.*, 262 S.W.3d at 328; *Havner*, 953 S.W.2d at 716-17; *Kramer*, 858 S.W.2d at 400.

[7] *See* Nat'l Inst. of Neurological Disorders and Stroke rt-PA Stroke Study Group, *Tissue Plasminogen Activator for Acute Ischemic Stroke*, 333 NEW ENG. J. OF MED. 1581 (1995); NINDS t-PA Stroke Study Group, *Generalized Efficacy of t-PA for Acute Stroke: Subgroup Analysis of the NINDS t-PA Stroke Trial*, 28 STROKE 2119 (1997).

other jurisdictions that causation had not been shown.[8] The issue in the Bendectin cases was whether the ingestion of that drug by women while pregnant caused birth defects in their children, specifically, limb reduction defects.[9] It was undisputed that limb reduction birth defects occurred when mothers had not taken Bendectin.[10] The Supreme Court of Texas held that a plaintiff must show that it was more likely than not that Bendectin was a cause of the defects.[11] The more than 50% likelihood causation standard under Texas law was the basis for the Texas court's holding that generally, epidemiological studies must show at least a doubling of the risk.[12] "[T]he requirement of a more than 50% probability means that epidemiological evidence must show that the risk of an injury or condition in the exposed population was more than double the risk in the unexposed or control population."[13]

In the present case, the "unexposed or control population" consists of the patients who were treated with placebo in the NINDS study and the 1997 article analyzing it. Table 3 of the 1997 article reflects that in the category applicable to Randall Young, 58% treated with placebo had an unfavorable outcome, and 41% treated with t-PA had an unfavorable outcome. The failure to treat with t-PA did not result in a more than doubling of the risk of an unfavorable outcome. Thus even our most charitable reading of the Youngs' evidence cannot support a jury finding in their favor. In absence of a fact issue, we AFFIRM the summary judgment.

---

[8] *See Havner*, 953 S.W.2d at 716 (citing decisions in other jurisdictions).

[9] *Id.* at 708.

[10] *Id.* at 714.

[11] *Id.* at 715.

[12] *Id.* at 715-18.

[13] *Id.* at 716.