COURT OF APPEALS









COURT
OF APPEALS

EIGHTH
DISTRICT OF TEXAS

EL
PASO, TEXAS

 

LUIS E. LINAN, M.D. and
EASTSIDE                )

WOMEN=S
HEALTHCARE CENTER, P.A.,)                    No.  08-00-00540-CV

                                                                              )

Appellants,                         )                 Appeal from the

                                                                              )

v.                                                                           )              
346th District Court

                                                                              )

CORINA A. ROSALES,                                      )          
of El Paso County, Texas

                                                                              )

Appellee.                           )                 
(TC# 98-2406)

                                                                              )

 

 

O
P I N I O N

 

Appellants Luis E.
Linan, M.D. and Eastside Women=s
Healthcare Center appeal a jury verdict of negligence in favor of Appellee Corina A. Rosales for
Dr. Linan=s
alleged malpractice of failure to timely diagnose Ms. Rosales= breast cancer which caused her to have
a mastectomy rather than breast conserving therapy.  On appeal, Appellants raise four issues:  (1) whether the evidence is legally and
factually sufficient to support the jury=s
finding on breach of duty; (2) whether the evidence is legally and factually
sufficient to support the jury=s
finding on causation; (3) whether the evidence is legally and factually
sufficient to support the jury=s
finding on damages; and (4) whether the trial court erred in admitting certain
medical bills.  We affirm in part,
reverse in part, and remand in part to reform the judgment with respect to
damages for past medical expenses.








FACTUAL
SUMMARY








In early February
1997, Corina Rosales detected a lump in her left
breast and made an appointment at the Eastside Women=s
Healthcare Center.  On February 21, she
was examined by Dr. Linan.  Her medical history revealed that she had
breast biopsies in 1978 and 1989 that involved benign cysts.  Her menstrual period had started on February
5 and she had discovered the lump a little less than a week later.  The medical notes and Dr. Linan=s testimony indicate that the lump was
palpable, round, non-tender, and mobile mass that was
about 1 x 2 centimeters (cm) in diameter. 
Dr. Linan=s
notes illustrate the lump on the upper twelve o=clock
position of the left breast.  He
subsequently noted that there were no skin changes.  At trial, he testified that the lump was not
visible to the eye and remembered it to be about one centimeter below the
skin.  Dr.
Linan testified that he told Ms. Rosales that in his
opinion, the lump was likely a fibroadenoma or a
benign mass.  His testimony and medical
notes reflect that he told her to return in two weeks for a follow-up.  He explained that he did not order any
diagnostic tests because at the time of his examination, the lump was not
persistent, that is, it had not been present for more than one menstrual
cycle.  Moreover, Dr. Linan
testified that had he ordered any diagnostic testing, he would not have ordered
a mammogram since Ms. Rosales=
mass was already a dominant mass, but he would have ordered an ultrasound to
rule out a fluid-filled cyst.  He claimed
that the only sure way to know that the lump was not cancerous was to do a
biopsy.  His medical notes suggest a
discussion concerning continuing self-breast exams versus a biopsy and that Ms.
Rosales declined the biopsy.  Dr. Linan testified that because she was mid-cycle, the
decision was made to wait and follow-up once she was past her next period.  He also testified that normal procedure
following an office visit is for the patient to take her chart and a routing
slip to a window at the front office to receive a follow-up appointment. 

Corina Rosales testified that she had discovered the lump
during a self-breast examination and that she had had sharp pains in her nipple
and had told this to Dr. Linan.  She recalled that the doctor examined her
breast when she was seated and when she was lying down.  Dr. Linan told her
that the lump felt like a cyst and that it did not feel like anything she
should worry about and that he had patients who have had lumps in their breasts
for years.  He did say that if it
bothered her, she could come back and he would have it removed.  She said that although he told her to
continue self-breast examinations, he did not suggest any other diagnostic
procedure and he did not tell her to come back in two weeks.  

Ms. Rosales= husband, Martin Flores, testified that
he was present in the examination room during Dr. Linan=s examination.  He told the jury that Dr. Linan
told his wife that he felt the lump, but that it did not feel bad, that it
could just be a cyst, that most lumps found by women through self-examination
are cysts, and that he had a lot of patients walking around with such
lumps.  He testified that he was
surprised by the quickness of the examination and that nothing was said about
another appointment or about removing the lump, although he did recall
Dr. Linan saying something about Adraining it.@  They were not given any paperwork when they
left the examination room.

Ms. Rosales
testified that by April 1997, the lump seemed to have grown and moved closer to
her armpit, but she did not notice any change in the skin over the lump.  She made an appointment for April 23 with Dr.
Luz Candelaria, by whom she had previously been
treated for headaches and tension.








Dr. Candelaria testified that he examined Ms. Rosales on April
23, and that he could immediately see an overt mass in the one o=clock position on her left breast.  He felt a hard mass and observed an orange
peel effect on the skin where the lump protruded against the skin.  He recorded on his examination notes that Ms.
Rosales reported the onset of the lump two months earlier and that she had seen
another doctor before seeing Dr. Candelaria.  Ms. Rosales told him that the doctor had said
that she should not worry because he thought that it was just a menstrual
estrogen-effect-cycle-induced mass.  Dr. Candelaria immediately ordered a mammogram which was
scheduled for the following day, April 24.

The first
mammogram suggested only that there was a 4 x 3 cm mass in the upper outer
quadrant of Ms. Rosales left breast.  The
radiologist reported that her breasts were very dense and recommended a Aconed down compression view@ mammogram and an ultrasound for
further evaluation.  Both recommended
tests were subsequently performed in succession, but it is not clear over what
time frame they were performed.  

The Aconed down compression view@ again showed an inconclusive 4 x 3 cm
mass that was Aamenable
for ultrasound guided biopsy.@  The radiologist=s
recommendation was for an ultrasound to further evaluate the mass, and he
suggested that an ultrasound-guided biopsy for histological evaluation was
appropriate.  An ultrasound was
subsequently performed and the radiologist=s
evaluation reported a breast mass that conformed with
the mammograms, that was approximately 2 x 1.9 cm in size with irregular
margins, and was suspicious for malignancy. 
The report also revealed a 12.8 x .5 millimeter (mm) cyst at the ten o=clock position and a 6.9 x .6 mm hypoechoic mass at the four o=clock
position.  The ultrasound-guided biopsy
was not ordered or performed.








On May 2, 1997,
Dr. Candelaria performed what he variously referred
to in his testimony and medical notes as a biopsy, excision of breast mass, or
lumpectomy.  His testimony and surgical
and pathology notes reflect that he made an elliptical incision around the mass
and excised a 5 x 3.5 x 3 centimeter section of skin and underlying breast
tissue.  In his 

post-operative
notes, Dr. Candelaria described the mass as Ahard, circumscribed, measuring
approximately 2 cm x 2 2
cm.@ 

The pathology
examination was performed on May 6.  The
entire specimen was inked to mark the margin of resection.  The sectioned specimen revealed that the
closest margin of resection to the tumor mass was 2 mm.  The tumor was diagnosed as a moderately
differentiated grade II to poorly differentiated grade III invasive ductal carcinoma that measured 1.8 x 1.5 x 1.5 cm.  Microscopic examination revealed a positive
margin; cancer cells extended out to the edge of the inked tissue.[1]


Ms. Rosales was
informed by Dr. Candelaria on May 7 of the positive
margin pathology report and according to his notes he suggested and she agreed
to have a modified radical mastectomy. 
At trial, he testified that he simply informed her of the options of a
re-excision or a modified radical mastectomy and that Ms. Rosales wanted the
whole breast removed.  This surgery was
performed the next day.








Corina Rosales ultimately brought suit against Dr. Linan and his employer, Eastside Women=s Healthcare Center, for medical
malpractice.  She contends Dr. Linan breached his standard of care by minimizing her
condition and failing to order appropriate diagnostic tests causing a two-month
delay in diagnosis.  She argues that this
negligence proximately caused her condition to worsen and resulted in complete
removal of her breast, and other consequential damages.

Dr. Linan and Ms. Rosales were found equally negligent by the
jury.  Ms. Rosales was found to have
sustained damages in the amount of $261,400. 
The court ordered defendants to pay $160,107.48, with post-judgment
interest of 10 percent and all court costs.

Standard
of Review of Legal and Factual Sufficiency

Appellants= first three issues relate to the
sufficiency of evidence to support the jury=s
findings of breach, causation, and the award of damages.  The standard of review for each of these
issues is the same.

On appellate
review of a legal insufficiency point, we consider only the evidence and
inferences that, when viewed in their most favorable light, tend to support the
finding.  Merrell
Dow Pharmaceuticals, Inc. v. Havner, 953 S.W.2d
706, 711 (Tex. 1997).  We
disregard all evidence and inferences to the contrary.  Id. 
If there is any evidence of probative force to support the finding, it
is upheld.  Sherman
v. First Nat=l
Bank in Center, Texas, 760 S.W.2d 240, 242
(Tex. 1988). 
Accordingly, if there is more than a scintilla of evidence, the jury=s finding will not be overturned.  Id. at 242.








In reviewing
factual sufficiency, we consider and weigh all of the evidence.  Ortiz v. Jones, 917
S.W.2d 770, 772 (Tex. 1996).  A
verdict is only set aside if the evidence is so weak or the finding so against
the great weight and preponderance of the evidence that it is clearly wrong and
unjust.  Cain v.
Bain, 709 S.W.2d 175, 176 (Tex. 1986).  A reviewing court=s
opinion may not be substituted for that of the trier
of fact.  Maritime
Overseas Corp. v. Ellis, 971 S.W.2d 402, 407
(Tex. 1998).

Medical Malpractice

A plaintiff must
prove four elements in a medical malpractice cause of action in order to
prevail:  (1) a duty by the physician to
act according to a certain standard; (2) a breach of the applicable standard of
care; (3) injury or harm to the plaintiff; and (4) a causal connection between
the breach of the applicable standard of care and the injury or harm.  Krishnan v. Ramirez, 42 S.W.3d 205, 212 (Tex.App.--Corpus Christi 2001, pet. denied).

In a suit for
medical malpractice, expert testimony is required to prove negligence unless
the form or mode of treatment is a matter of common knowledge, or the matter is
within the experience of a layperson.  See Hood v. Phillips, 554 S.W.2d 160, 165-66 (Tex. 1977);
Arlington Memorial Hospital Foundation, Inc. v. Baird, 991 S.W.2d 918,
921-22 (Tex.App--Fort Worth 1999, pet. denied).  In particular, expert testimony is necessary
on the issues of medical negligence and causation.  Arlington Memorial
Hospital Foundation, Inc., 991 S.W.2d at 922.  

Breach
of  Standard of
Care

In Issue One,
Appellants contend Ms. Rosales failed to prove by legally sufficient expert
testimony that Dr. Linan breached the standard of
medical care.  In the alternative, they
argue that the evidence supporting the jury=s
finding of breach is so weak that the finding is clearly wrong and manifestly
unjust.








The breach of the
standard of care allegations had a two-fold premise.  The first is that Dr. Linan
failed to timely diagnosis breast cancer by failing to order any diagnostic
testing at the time of his examination on February 23, 1997.  The other is that he failed to instruct Ms.
Rosales to return in two weeks for a follow-up evaluation giving the cancerous
breast tumor two months to grow.

There is no
dispute as to Ms. Rosales=
medical condition and history when Dr. Linan examined
her on February 23, 1997.  She was
thirty-eight years old, premenopausal, with small,
dense breasts.  In 1978 and 1979, she had
breast biopsies that removed benign masses. 
Her menstrual period had begun on February 5 and she had discovered the
lump in her left breast about a week later. 
She was examined by Dr. Linan two weeks after
she discovered the lump.  The lump was in
the upper, outer area of her breast above the nipple.  There were no noticeable changes or effects
in the skin overlaying the lump.  The
lump was palpable and had a 

well-defined
round shape; it was about 1.5 centimeters in size, not tender, and mobile.

About two and a
half months later, the lump would prove to be cancerous and the pathology of
the tumor is not disputed.  It was an
Invasive Ductal Carcinoma (IDC), an early form of
breast cancer, graded as a Stage I or T1 tumor. 
It was less than 2 centimeters (cm) in size.  The cancerous cells had penetrated the duct
or lobule wall and invaded the surrounding breast tissue and there was local
lymphatic involvement, but there was no evidence that it had spread beyond the
breast or that there was cancerous involvement of the axial lymph nodes.  It was a fast growing, but highly treatable
form of breast cancer.

Ms. Rosales
testified and the essence of her testimony is that Dr. Linan
told her not to worry because the lump was probably a benign cyst, but she
could have it removed if she wanted; that he did not offer or suggest any
further diagnostic testing; and he never told her to come back in two weeks for
a follow-up examination.  Her husband,
who was present during Dr. Linan=s examination, essentially agreed with
Ms. Rosales=
testimony.








The only explicit
evidence from an expert witness that supports the allegation of negligence by
Dr. Linan comes from Dr. Candelaria.  Dr. Candelaria
testified that it was a breach of the standard of care for Dr. Linan to have not immediately ordered a mammogram.  His testimony was unequivocal; whether it was
reliable is another matter.  He testified
quite assuredly that the mammogram was Aone
of the newest techniques in radiology that is used to detect abnormal tissue,@ and that a mammogram could distinguish
between cystic masses and hard masses. 
He disagreed with Dr. Linan=s purported offer to order a biopsy,
stating that a biopsy could be avoided by doing a mammogram or ultrasound exam
first.  He also testified that it would
be a breach of the standard of care to order a biopsy without knowing what the
mass was.








Dr. Joel
Abramowitz, a physician board certified in hemotalogy,
onocology, and internal medicine also testified on
behalf of Ms. Rosales.  According to Dr.
Abramowitz, the diagnostic tools available to determine the malignancy or
prognosis included the mammogram and ultrasound, but that ultimately, the only
way to know for sure whether a mass is benign or malignant is to do a
biopsy.  He concluded that clinical
evaluations made by Dr. Linan and Dr. Candelaria show that the tumor had grown in the two months
between their respective examinations. 
He also noted that the pathology reports showed that the tumor was high
S-Phase, meaning that the tumor was a quick growing cancer.  He testified that if Ms. Rosales had the lumpectomy
in February 1997, the tumor would have been smaller than it was in May 1997 and
that, in general, a delay in diagnosing a malignant
tumor increases the risk of the cancer spreading.  He did concede that the delay between
February 21 and April 23 did not materially change the ultimate prognosis.  He also testified that she could have had the
lumpectomy with breast conservation excision and radiation in May 1997, and
that most surgeons, if the patient wanted breast conservation, would do a
lumpectomy with breast conservation if the tumor was less than 3 cm.  He stated that it was possible for cancer to
metastasize in two months, but he also admitted that it was Avery hard to know scientifically how
much a delay is causing a problem or led to a proximate cause.@ 
It appears then, with respect to the element of breach of standard of
care, Dr. Abramovitz=s
testimony only vaguely, and only implicitly faults Dr. Linan
for the more than two month delay.

Dr. Ann Leitch, a surgical oncologist, testified that Ms. Rosales
was a good candidate for breast conserving surgery because the tumor was
relatively small.  She discounted
Dr. Candelaria=s
clinical observations of orange peel skin and testified that if there had been
an orange peel effect on the skin, then the cancer should have been classified
as a stage IIIB cancer and it was not the standard of care to do a lumpectomy
with that cancer stage.  She also
testified that it was not reasonable that the passage of time caused Ms.
Rosales to have a mastectomy.  She
explained that a tumor has to be greater than 1 cm to be detected by touch and
since it was found to be only 1.8 cm, the tumor had clearly not grown
dramatically.

Dr. Raul Portillo,
an oncologist, testified that the surgical procedure on May 2, 1997 was a
diagnostic biopsy and that Ms. Rosales would have had a second procedure to do
either a lumpectomy with axillary dissection of lymph
nodes or a mastectomy.  








While we have
serious doubt as to the reliability of Dr. Candelaria=s testimony, which appears to be
largely self-serving and dated, whether or not Dr. Linan
breached the standard of care by failing to immediately order a mammogram need
not be answered.  Dr. Linan=s medical notes indicate that his
orders were for Ms. Rosales to return for a follow-up examination in two weeks,
at which time, he could determine whether the lump was persistent and order
appropriate diagnostic tests; however, it is clear from the record that these
orders were not carried out and Ms. Rosales was never given a follow-up
appointment.  Accordingly, while Ms.
Rosales= first
premise for breach of standard of care is dubious, we do agree that the
evidence is legally and factually sufficient to find the second premise of her
negligence allegation.  We overrule the
first issue.

In their second
issue, Appellants challenge the legal and factual sufficiency of the evidence
to establish the causal connection between the breach of the standard of care
and the injury or harm suffered by Ms. Rosales. 
Ms. Rosales had to establish a causal connection between her injury and
the negligence of Dr. Linan based upon Areasonable medical probability,@ not mere conjecture, speculation, or
possibility.  See,
e.g., Park Place Hosp. v. Estate of Milo, 909 S.W.2d 508, 511 (Tex. 1995); Burroughs
Wellcome Co. v. Crye,
907 S.W.2d 497, 500 (Tex. 1995); Kramer v. Lewisville Mem.
Hosp., 858 S.W.2d 397, 400
(Tex. 1993); Duff v. Yelin, 751 S.W.2d 175, 176 (Tex. 1988).  This means that the ultimate standard of
proof on the causation issue Ais
whether, by a preponderance of the evidence, the negligent act or omission is
shown to be a substantial factor in bringing about the harm and without which
the harm would not have occurred.@  Park Place Hosp.,
909 S.W.2d at 511, citing Kramer, 858 S.W.2d at 400.  As both parties have framed the causation
issue in this case, the issue is would there have been a better outcome had the
diagnosis of Ms. Rosales=
breast cancer been accomplished two months earlier, and if so, would that
better outcome have been a breast sparing lumpectomy rather than a modified
radical mastectomy.  








We have spent much
time and careful analysis of the testimony and the voluminous medical records
to assure ourselves that the jury returned a verdict that was sufficiently true
in accordance with the evidence.  Indeed,
all the evidence and arguments about how fast or how slow the tumor grew, or
whether Dr. Candelaria=s
surgical adroitness was an intervening factor in causation only served to cloud
our examination, and ultimately, we conclude that such evidence is irrelevant.

Dr. Linan testified and his notes reflect that on February 21,
1997, he observed no skin changes when he examined Ms. Rosales.  Then about two months later, in May 1997,
Dr. Candelaria testified, and as he recorded in
his surgical notes, there was Avery
obvious prominent mass to the left breast with the skin having an orange
peel appearance.@  [Emphasis added].  APeau d=orange,@ as Dr. Abramowitz explained, (the appearance
of an orange peel) is a clinical description where cancer cells have invaded
the lymphatic vessels causing swelling or edema of the skin overlying the
tumor.  Then Dr. Leitch,
though she disbelieved Dr. Candelaria=s diagnosis, nevertheless testified
that such a breast cancer is classified as an overall Stage IIIB cancer,
regardless of the tumor size. 
Critically, she testified that breast conserving surgery is not
appropriate and is not the standard of care for Stage IIB cancer.  She concluded that a mastectomy is generally
the standard of care for such breast cancer. 


Dr. Raul Portillo,
a board certified oncologist, testified that under current surgical protocols,
the procedure that Dr. Candelaria employed would be
classified as a diagnostic biopsy and not breast conserving therapy.  A proper breast sparing lumpectomy would be
the removal of the tumor with clear margins plus an axillary
dissection or removal of the lymph nodes, followed by a regime of radiation.  








So while Dr. Candelaria may have thought that he was following breast
conserving therapy surgical protocols, and while there is abundant evidence in
the record that Ms. Rosales probably could have had breast conserving surgery,
there is still legal and factual evidence that in the two months between when
Ms. Rosales should have had a follow-up examination with Dr. Linan, and when she was finally seen by Dr. Candelaria, the cancer had involved the lymph vessels
causing an edema on the skin.  At that
point, there was no better outcome--a mastectomy was the standard of care, but
two months earlier, when there was no evidence of involvement of the lymphatic
vessels by the cancer, breast conserving therapy could have been the
outcome.  Issue Two is overruled.

In Issue Three,
Appellants argue that there is legally or factually insufficient evidence to
support the jury=s finding
on damages.  The first contention is that
there was no segregation of damages, specifically the medical bills, caused by
Dr. Linan=s
negligence from those medical costs that would have accrued irrespective of the
negligence.  The evidence is clear that
when Ms. Rosales first saw Dr. Linan, she had a
cancerous tumor.  It is clear that if it
had been diagnosed soon thereafter that breast conserving therapy, a
lumpectomy, axillary dissection of the lymph nodes,
chemotherapy, and radiation, would more than likely have been successful.  So even if Ms. Rosales had gotten a timely
diagnosis of breast cancer and had breast conserving therapy, she still would
have had to undergo many of the medical procedures that she ultimately
undertook.  She would have had radiology treatments
at a cost of $23,297; she would have had chemotherapy at a cost of $23, 997;
she still would have had the diagnostic and pathology tests at a cost of $604;
she would have had about $4,000 in hospital costs at Southwestern General; and
she would still have had most of the fees that Dr. Candelaria
alleged. 








A plaintiff may
recover only for reasonable and necessary medical expenses specifically shown
to result from treatment made necessary by the negligent acts or omissions of
the defendant, where such a differentiation is possible.  See Texarkana Memorial
Hosp., Inc. v. Murdock, 946 S.W.2d 836, 840 (Tex. 1997).  Consequently, we sustain the first portion of
Issue Three; however, because Ms. Rosales has made an offer to remit, we will
not reverse and remand for a new trial but will instead affirm and reverse and
remand to reform the judgment to exclude the medical costs not caused by any of
the alleged negligence, and find that Ms. Rosales is entitled to $8,283 in past
medical costs, and that the damages should be reduced by $51,898.

Appellants= second contention regarding the legal
and factual insufficiency of the evidence to support the jury=s findings of damages concerns Ms.
Rosales= damages
for Physical Pain and Mental Anguish, Loss of Past Earnings Capacity,
Disfigurement in the Past and in the Future, and Medical Care in the
Future.  There was ample evidence from
Ms. Rosales and several others that she had suffered physical pain and mental
anguish; there was at least some evidence that she was unable to work and of
lost earnings capacity; the loss of her breast is without a doubt evidence of
disfigurement; and finally, it is self-evident that she will have medical costs
in the future.  The jury has broad
discretion to assign a specific dollar amount to compensate a person for these
kinds of damages.  We find that the
evidence supporting these elements is legally and factually sufficient to
support the jury=s finding
of damages and overrule Issue Three in this regard.








In the fourth and
final issue, Appellants complain generally that the trial court erred in
admitting medical records for treatments not caused by Dr. Linan=s negligence.  We first note that whether to admit or
exclude evidence is a matter committed to the trial court=s sound discretion.  Interstate Northborough
Partnership v. State, 66 S.W.3d 213, 220 (Tex. 2001).  The foundation for this issue rests upon the
Appellants= basic
premise of no showing of causation. 
Because we have already addressed this foundation above, it is not
necessary to address it again.  We
overrule Issue Four. 

The trial court=s judgment is reversed in part with
respect to the amount of damages awarded to Ms. Rosales for past medical
expenses and remanded to reformed to exclude medical
costs not caused by Appellants=
negligence, and affirm the remainder of the judgment. 

 

 

March
31, 2004

DAVID WELLINGTON
CHEW, Justice

 

Before Panel No. 2

Barajas, C.J., McClure, and Chew, JJ.











[1]
We note that the original pathology report erroneously reported in the ADiagnosis@
section of the report that the size of the tumor was 5 x 3.5 x 3 centimeters,
(which is the size of the complete excised specimen) when, in fact, the tumor
was only 1.8 x 1.5 x 1.5 centimeters in size.