In The



Court of Appeals



Ninth District of Texas at Beaumont



 ______________________ 


 

NO. 09-07-074 CV


 ______________________



CHRISTUS HEALTH SOUTHEAST TEXAS D/B/A 


ST. ELIZABETH HOSPITAL, Appellant



V.



ROSALIND HALL, JAMES WEISNER, AND 


GWENDOLYN WASHINGTON, AS REPRESENTATIVES 


OF THE ESTATE OF ESTHER JOLIVETTE, Appellees






On Appeal from the 136th District Court


Jefferson County, Texas


Trial Cause No. D-173,522






MEMORANDUM OPINION


 A jury found Christus Health Southeast Texas, doing business as St. Elizabeth
Hospital, liable for medical negligence and awarded damages for medical bills and past pain
and mental anguish. Christus appeals the trial court's judgment. Because the evidence of
proximate cause is insufficient, the judgment is reversed and the case is remanded for a new
trial. 

Background
 

 Esther Jolivette, a patient at Christus, was scheduled to receive a cardiac pacemaker. 
There is evidence in the record that Jolivette's daughter, Rosalind Hall, explained to the
hospital staff at each shift that Jolivette was confused and disoriented at times. In addition,
hospital records indicated Jolivette was confused and had dementia. 

 Dr. Paris Bransford implanted a pacemaker on November 4, 2003. After completing
the procedure, Dr. Bransford stepped out of the catheterization lab to discuss the results with
Hall. A nurse testified Jolivette "flipped very suddenly" off the procedure table and fell to
the floor. Dr. Bransford ordered tests to determine whether Jolivette had suffered any 
injuries in addition to the bruises to her face, swelling around her eye, and the swelling in her
arm. Tests did not reveal any further injuries. The pacemaker manufacturer's representative
tested Jolivette's pacemaker approximately one hour after the fall and found the pacemaker
was functioning properly. 

 Jolivette was transferred to a hospital room shortly after twelve noon on November
4, 2003. The written instructions to the patient stated that the patient is to "keep [her] arm
by [her] side for 48 hours" and "[n]o reaching, pulling, or stretching with that arm." Dr.
Bransford ordered an immobilizer for Jolivette's arm. The nurses' notes state that at 1:15
p.m. on November 4, Jolivette was "found between rails attempting to amb[ulate] to
bathroom." At 4:15 p.m., the nurses' notes indicate Jolivette was found "sitting up in bed
one leg between bedrails." Nurses' notes reflect that Jolivette was "noncompliant
persistently moves arm in direction she wants" and that she was "not able to comprehend
fully." 

 The attending nurses at Christus informed Dr. Bransford of Jolivette's continued
movement. At 4:16 p.m. on November 4, Dr. Bransford instructed the nurses to administer
Ativan in an attempt to calm Jolivette and reduce her movement; this was in addition to the
immobilizer. The floor nurses administered the medication at approximately 5:00 p.m. 
Another order for Ativan was given at 6:30 p.m. At 9:50 p.m., the nurses administered
Ativan again. A few minutes after midnight, on November 5, a Dr. Johnson authorized the
use of "soft bil wrist restraints," if needed, and to administer additional Ativan, if needed. 
 The initial surgery report of Dr. Bransford appeared to attribute the dislodgement of
the pacemaker leads to the fall from the catheterization table. Subsequently, during his July
3, 2006, deposition, Dr. Bransford testified that, based on an x-ray and on the pacemaker
representative's test conducted approximately one hour after the November 4 surgery, 
Jolivette's arm movement caused the dislodgement of the leads. The dislodgement occurred
sometime between 1:48 p.m. on November 4, 2003, and 10:30 a.m. on November 5, 2003,
(the day after the implantation procedure). On November 5, 2003, at approximately 10:30
a.m., a test found the lead had dislodged. The next day, Dr. Bransford reimplanted the
pacemaker leads in Jolivette's heart. Jolivette was discharged from the hospital on
November 7, 2003, and died some months later. (1) 

The Statute of Limitations


 In issue one, Christus argues the statute of limitations bars the medical negligence
finding by the jury. The jury found the negligence of Christus, its nurses, or employees
proximately caused Jolivette's pacemaker leads to become displaced after the procedure in
the catheterization lab. Christus asserts that the limitations period began to run no later than
November 7, 2003, (the date Jolivette was last seen and discharged from Christus), and that
limitations expired no later than November 7, 2005. 

 In her original petition, Hall pled specifically, in addition to more general allegations, 
that Christus was negligent in failing to prevent Jolivette from falling off the procedure table
in the catheterization lab, and that the fall caused the pacemaker leads to be dislodged. On
September 18, 2006, Hall filed a second amended original petition, alleging that the
"implantation of the pacemaker had been damaged either by the fall [on November 4] or the
movement of her arms from lack of restraint[.]" Hall further pled in the second amended
petition that "on November 6, 2003, Mrs. Jolivette underwent a second pacemaker surgery
made necessary as a result of the fall off the procedure table after the first pacemaker surgery,
with further insufficient preventions."

 Christus argues the plaintiffs pled a new negligence theory -- failing to adequately
restrain Jolivette after the November 4 pacemaker implantation -- that is not subsumed within
the "catch-all allegations of negligence" claims of the original and first amended petitions. 
Christus asserts that the post-fall, lack-of-restraint theory is based on a new, distinct, or
different transaction or occurrence and is barred by the statute of limitations. The two year
statute of limitations for medical negligence actions is found in section 74.251 of the Texas
Civil Practice and Remedies Code. See Tex. Civ. Prac. & Rem. Code Ann. § 74.251
(Vernon 2005). Christus asserts Hall did not plead her new negligence theory until after the
statute of limitations had run, and the trial court's judgment should be reversed and a take-nothing judgment rendered. 

 Appellees argue the allegations in the original and amended petitions are broad
enough to encompass any post-operative nursing negligence. (2) A review of the first petition 
reveals plaintiffs asserted a tort claim concerning the implantation of a cardiac pacemaker
and the subsequent dislodgement of pacemaker leads caused by Christus's negligence. The
second amended petition likewise presents a claim of negligent care causing dislodgement
of the leads. The original petition focuses on the fall from the catheterization table as the
cause of dislodgement, and the last petition adds the after-fall care as a cause. 

 Even if the amended petition is interpreted as changing the facts or grounds of
liability, the subsequent amendment is not subject to a plea of limitations. See Tex. Civ.
Prac. & Rem. Code Ann. § 16.068 (Vernon 1997). Section 16.068 provides that if a filed
pleading relates to a cause of action that is not subject to a plea of limitation when the
pleading was filed, a subsequent amendment that changes the facts or grounds of liability is
not subject to a plea of limitation unless the amendment is wholly based on a new, distinct,
or different transaction or occurrence. Id.; see Alexander v. Turtur & Assocs., Inc., 146
S.W.3d 113, 121-22 (Tex. 2004). Both Hall's original and amended petitions sought the
recovery of damages caused by the hospital staff's negligent supervision of Jolivette
following the implantation of a cardiac pacemaker. 

 Christus relies on Sanders v.Construction Equity, Inc., 42 S.W.3d 364, 369 (Tex.
App.--Beaumont 2001, pet. denied). There, the homeowners sued a builder "for monetary
damages arising out of a defective fireplace and gas logs that did not work properly." Id.
at 366. After the statute of limitations expired, the plaintiffs filed an amended petition
asserting construction defect claims under various causes of action. Id. at 366-68. "[T]he
Sanders' second amended petition assert[ed] new claims unrelated to the fireplace and gas
log problems[.]" Id. at 367. We explained the original pleading was specific and narrowly
focused, and the "host of new complaints" asserted as defects in the second amended
pleading did not relate back to the timely-filed initial pleading. Id. at 369. Unrelated to the
fireplace and logs, the new assertions were a "myriad of complaints terminating in the
conclusion by the Sanders that the house was just poorly constructed overall." Id. The
instant case is distinguishable. While Sanders involved new claims and new injuries, the
injury here is dislodgement of the pacemaker leads caused by negligent care after the
implantation of the pacemaker. 

 Christus also relies on Harris v. Galveston County, 799 S.W.2d 766 (Tex. App.--Houston [14th Dist.] 1990, writ denied). There, the plaintiff filed three petitions. Id. at 767-68. The original petition against the county hospital, doctors, and a nurse alleged negligence
in connection with the plaintiff's surgery. Id. at 767. The second amended petition alleged
causes of action against the county for negligent monitoring of staff physicians under the
Texas Tort Claims Act. Id. The third amended petition alleged for the first time a cause of
action for negligent post-operative use of property (failure to obtain a proper bed). Id. at
767-69. The court of appeals found the new cause of action did not relate back to the
original petition and was barred by limitations. Id. at 769. Harris also is distinguishable. 
Unlike Harris, the negligence claims here involve a continuum related to a failure to properly
attend, monitor, and restrain Jolivette after the doctor implanted the pacemaker. 

 Christus refers us to Contreras v. Halcomb, No. 13-97-895-CV, 1999 Tex. App.
LEXIS 5289 (Tex. App.--Corpus Christi July 15, 1999, no pet.) (not designated for
publication). The plaintiff sued the doctor for negligence relating to two surgeries;
ultimately, the plaintiff filed a third amended petition for a doctor visit based on a different
act of negligence that "cannot be considered as a continuous course of treatment related to
the first and second surgeries. . . ." Id. at **9-10. Unlike Contreras, the acts of negligence
here are part of a continuous course of treatment.

 The occurrence on which the plaintiffs' suit is based is the dislodgement of the
pacemaker leads. Whether the leads were dislodged by the fall from the table in the heart
catheterization laboratory or by Jolivette's post-fall arm movements, the claimed breach of
duty by Christus is still the failure to properly monitor and restrain Jolivette, and the claimed
injury is still dislodgement of the leads. 

 "An original pleading tolls the limitation period for claims asserted in subsequent,
amended pleadings as long as the amended pleading does not allege a wholly new, distinct,
or different transaction." Alexander, 146 S.W.3d at 121. The plaintiffs' original and
amended petitions both sought the recovery of damages caused by the hospital staff's alleged
negligent supervision of Jolivette following the implantation of a cardiac pacemaker. The
second amended petition relates back to the original petition. We overrule issue one.

Causation


 Christus argues in issue three that the evidence is legally and factually insufficient to
support a finding of proximate cause -- specifically that Christus's failure to apply post-operative restraints on Jolivette proximately caused the dislodgement of her pacemaker leads.
In a medical negligence case, the plaintiff must show by a preponderance of the evidence to
a degree of "reasonable probability" that the injury was proximately caused by the negligence
of the defendant. See Park Place Hosp. v. Estate of Milo, 909 S.W.2d 508, 511 (Tex. 1995); 
Kramer v. Lewisville Mem'l Hosp., 858 S.W.2d 397, 399-400 (Tex. 1993); Duff v. Yelin, 751
S.W.2d 175, 176 (Tex. 1988). Proximate cause consists of both cause-in-fact and
foreseeability. See IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason, 143 S.W.3d
794, 798 (Tex. 2004). To prove causation, the negligent act or omission must be "shown to
be a substantial factor in bringing about the harm and without which the harm would not
have occurred." Kramer, 858 S.W.2d at 400; see also Park Place Hosp., 909 S.W.2d at 511. 

 Lucilla Yeung, a geriatric nurse practitioner, testified concerning standards of care
for nurses and breaches of those standards. Though qualified to testify to those elements, a
nurse, under Texas law, is not qualified to testify to medical causation of a patient's injury. 
Section 74.403(a) of the Texas Civil Practice and Remedies Code provides (subject to certain
exceptions not applicable here) as follows:

 [I]n a suit involving a health care liability claim against a physician or health
care provider, a person may qualify as an expert witness on the issue of the
causal relationship between the alleged departure from accepted standards of
care and the injury, harm, or damages claimed only if the person is a physician
and is otherwise qualified to render opinions on that causal relationship under
the Texas Rules of Evidence.



Tex. Civ.Prac. & Rem. Code Ann. § 74.403(a) (Vernon 2005); see also Kettle v. Baylor
Med. Ctr. at Garland, 232 S.W.3d 832, 841 (Tex. App.--Dallas 2007, pet. denied) (A
registered nurse may not testify as to medical causation of a patient's injury or that any
particular treatment would have prevented injury; however, a nurse's medical expert report
may be considered in conjunction with a physician's medical expert report.); Esquivel v. El
Paso Healthcare Sys., Ltd., 225 S.W.3d 83, 90-91 (Tex. App.--El Paso 2005, no pet.). 

 Dr. Bransford, the physician who implanted the pacemaker, is the only physician who
testified to post-fall causation. He explained that an exaggerated arm movement can pull the
lead out of position. He stated that Jolivette's post-operative movement of her arm probably
caused the dislodgement of the leads --- though he could not say with one hundred percent
certainty it was the cause. "[I]t is the only scientific, reasonable, more likely than not
explanation that thing that could have caused it within this time frame[.]" Dr. Bransford
testified:

 Q. [Plaintiff's Counsel]: Okay. Had they contacted you after these three
inciden[ts], would you have permitted at least soft restraints?

 A. [Dr. Bransford]: Yes.

 Q. That . . . would have been sufficient probably to prevent the movement of
the arms that would have caused the dislodgement?

 A. Yes, I agree.


Dr. Bransford also testified to the following: 


 Q. [Plaintiff's Counsel]: And you answered a question to [defense counsel]
and I may have missed it when he said when you have a patient who is -- who
is doing this after a few hours after the pacemaker implantation, would the
next step be to jump to the restraints and I heard you say yes. 

 A. [Dr. Bransford]: I did.

 Q. And --

 A. But that's not what I did.

 Q. Can the nurses phone you and say, "We're going to restrain this patient. 
What do you think?"? 

 A. Sure, they can -- they can ask that question.

 Q. Who has more contact with the patients on an hour to hour basis; you or the
nurse?

 A. The nurses.

 Q. And as a medical doctor, you rely on the nurses to contact you about this,
right?

 A. Yes, and they did contact me.

 Q. In this situation, had these nurses told you about all these instances, Dr.
Bransford, where she's climbing through the bed rails, she's moving her arms,
where she's wondering in the hallway, wouldn't you -- if they had told you the
whole story, wouldn't you have suggested a restraint?

 A. Be honest with you, I suspect they did tell me the whole story. You know,
one of the problems with restraints and physicians, you know, it is we get such
negative feedback from families and patients about restraints that, yes, maybe
sometimes you do break our own rules and may start off with a little bit of
sedation. It is such a big deal. I'm not -- I can't put it off on these nurses. I
do think they did notify me.

 Q. And had the nurses wanted to, they could have said, "We really think this
patient needs to be restrained," and you would have done it?

 A. Well, yeah.

 . . . .


 Q. The answer to the question is had the St. Elizabeth nurses said, "Based
upon our contact with this patient, we must restrain her," they could have, a,
done it and, b, told you about it?

 A. I don't know if they can. I think they have to have special orders for that.

 Q. What is the rule on that at St. Elizabeth, do you know?

 A. No. I rely on the nurses to help me with that.

 . . . .


 Q. But in this instance, had these nurses told you, "Restrain this patient," you
would have done it?

 A. Well, yes.

 Q. And they didn't tell you that?

 A. Yes, but I can hardly find fault with them for that. I'm ultimately response
I believe.

 Q. All right. I understand that, Doctor. But they're the ones that have more
contact with the patient, don't they? 

 A. I agree, yes. 


 Dr. Bransford's testimony is conflicting. He indicated that had the nurses contacted
him after these incidents, he would have permitted at least soft restraints, and those restraints
would have probably been sufficient to prevent the arm movement that caused the
dislodgement. Yet he also testified the nurses did contact him, and he suspects they did tell
him "the whole story." They informed him of Jolivette's arm movement and agitation. In
response, he ordered Ativan, not physical restraints.

 When analyzing a legal sufficiency claim, we view the evidence in the light most
favorable to the verdict, and credit favorable evidence if reasonable jurors could, and
disregard contrary evidence unless reasonable jurors could not. City of Keller v. Wilson, 168
S.W.3d 802, 807 (Tex. 2005). The evidence is legally sufficient if it enables reasonable and
fair-minded people to reach the verdict under review. Id. at 827. In a factual sufficiency
review, a court of appeals considers all of the evidence and sets aside the verdict only if the
evidence is so weak or the finding is so against the great weight and preponderance of the
evidence that it is clearly wrong and unjust. Dow Chem. Co. v. Francis, 46 S.W.3d 237, 242
(Tex. 2001); Garza v. Alviar, 395 S.W.2d 821, 823 (Tex. 1965). 

 Dr. Bransford testified at one point that had the nurses expressly informed him of the
need for a higher level of restraints, he would have ordered them. He also testified the nurses
informed him about Jolivette's condition, and he responded by ordering a chemical restraint. 
In a legal sufficiency review, assuming reasonable jurors could resolve conflicts in the
evidence, an appellate court generally disregards the conflicting evidence that does not
support the verdict. See City of Keller, 168 S.W.3d at 821. Dr. Bransford's conflicting
testimony provides some evidence to support the jury's proximate cause finding. We
therefore overrule appellant's legal sufficiency point and deny the request that a take-nothing
judgment be rendered. 

 Christus also attacks the factual sufficiency of the evidence. Under the Texas
Constitution, courts of appeals are charged with conducting "conclusive appellate review of
all factual sufficiency questions that are properly presented on appeal." In re M.R.J.M., 193
S.W.3d 670, 675 (Tex. App.--Fort Worth 2006, no pet.) (citing Tex. Const. art. V, § 6(a);
Tex. Gov't Code Ann. § 22.225(a)(Vernon Supp. 2007)). Factual sufficiency points assume
conflicting evidence on an issue, and argue that a finding is erroneous because the evidence
supporting the finding, though legally sufficient, is too weak or the evidence against the
finding is overwhelming. See Raw Hide Oil & Gas, Inc. v. Maxus Exploration Co., 766
S.W.2d 264, 275 (Tex. App.--Amarillo 1988, writ denied). 

 By statute, only a physician is qualified to testify to the "causal relationship between
the alleged departure from accepted standards of care and the injury . . . ." See Tex. Civ.
Prac. & Rem. Code Ann. § 74.403(a). Dr. Bransford explained his opinion that the nurses
were not at "fault," which suggests the nurses' conduct was not the cause of the injury in his
view. Although Dr. Bransford indicated he would have ordered restraints had he been
expressly informed of the need for them, he also testified he could "hardly find fault" with
the nurses' reports to him, and that he "can't put it off on these nurses. I do think they did
notify me." He suspected they did tell him "the whole story." He explained the problematic
nature of physical restraints and the "negative feedback" from families and patients. After
the nurses called to inform him of Jolivette's condition, Dr.Bransford chose not to move to
a higher level of restraint and instead ordered a chemical restraint. Dr. Bransford's testimony
that he could "hardly find fault" with the nurses' reports to him, along with medical records
documenting calls to Dr. Bransford and his order for medication rather than physical
restraints, makes his other testimony too weak to support the finding that the nurses' conduct
was a proximate cause of injury. The factual sufficiency point in issue three is sustained. (3) 
 When a court of appeals sustains a factual sufficiency point, the case must be
remanded for a new trial. See Glover v. Tex. Gen. Indem. Co., 619 S.W.2d 400, 401-02 (Tex.
1981). The judgment is reversed, and the case is remanded for a new trial.

 REVERSED AND REMANDED.

 ____________________________

 DAVID GAULTNEY

 Justice


Submitted on March 13, 2008

Opinion Delivered July 17, 2008

 

Before McKeithen, C.J., Gaultney and Kreger, JJ.
1. Jolivette's children -- Rosalind Hall, James Weisner, and Gwendolyn Washington --
filed suit, as representatives of Jolivette's estate, against Christus. 
2. Appellees also argue Christus waived any complaint about the "catch-all" negligence
allegations by failing to specially except. 
3. In its last issue, Christus also argues the plaintiff failed to prove that the sum 
awarded by the judgment for medical expenses was actually paid or incurred by or on behalf
of Jolivette. Section 41.0105 of the Texas Civil Practice and Remedies Code provides as
follows: 

 In addition to any other limitation under law, recovery of medical or
health care expenses incurred is limited to the amount actually paid or incurred
by or on behalf of the claimant.

Tex. Civ. Prac. & Rem. Code Ann. § 41.0105 (Vernon Supp. 2007). The statute is a
limitation on recovery of medical expenses. Christus argues that there is no proof that
judgment amount was actually incurred or paid by the plaintiffs, or on their behalf. We need
not reach this issue, however, because a new trial is required under issue three.