# Supreme Court of Texas

No. 24-0879

In re Leo Lapuerta, M.D., F.A.C.S., and The Plastic Surgery
Institute of Southeast Texas, P.A.,

*Relators*

On Petition for Writ of Mandamus

**Argued December 4, 2025**

CHIEF JUSTICE BLACKLOCK delivered the opinion of the Court.

Ordering a new trial in contravention of a jury verdict is "an unusually serious act." *In re Rudolph Auto., LLC*, 674 S.W.3d 289, 302 (Tex. 2023). An order granting a new trial must therefore provide a lawful, reasoned basis for so doing, which both facilitates appellate review and, ideally, demonstrates that the court's action reflects more than mere dissatisfaction with the verdict. *See In re Columbia Med. Ctr. of Las Colinas, Subsidiary, L.P.*, 290 S.W.3d 204, 212–13 (Tex. 2009). Although the power to grant a new trial lies within the court's discretion, if the reasons given are "predicated on legal error or lack[] record support," an appellate court should grant mandamus relief to restore the jury's verdict and avoid wastefully duplicative proceedings. *Rudolph*, 674 S.W.3d at 302.

After a jury trial in this personal injury suit resulted in an 11–1 defense verdict, the district court ordered a new trial for reasons that, as explained below, misperceived the law governing liability for medical negligence. Apart from that error, reversible in its own right, the new trial motion attached a letter from the lone dissenting juror purporting to reveal the contents of the jury's deliberations, which the plaintiff offered to show that the jury had been confused by the charge. Although the new trial order did not specifically rely on the juror's letter, we will not ignore the possibility that this flagrantly improper evidence influenced the outcome. The petition for writ of mandamus is conditionally granted, and the district court is directed to render judgment based on the verdict.

## I.

Jose Torres suffered a severe injury to his right index finger in a bandsaw accident. Leo Lapuerta, a plastic surgeon, treated Torres. Lapuerta described the tip of the finger as "hanging by a thread." Because of the injury's severity, Lapuerta recommended amputation of the finger. Torres refused, and Lapuerta attempted a salvage procedure that included cleaning and bandaging the finger. Torres had several follow-up visits with Lapuerta. Lapuerta recommended and performed skin flap surgery on July 11, 2016, which included a skin graft covering two fingers because of the index finger's skin condition and exposed bone.

Torres later saw a different surgeon, Dr. Henry, who diagnosed osteomyelitis, a bone infection. Henry tried treating the injury with debridement—the removal of damaged tissue and foreign debris—but

2

ultimately amputated the finger. He performed a "ray amputation" resulting in the removal of the entire index finger and the metacarpal bone that extends from the base of the index finger to the wrist bones.

Torres sued Dr. Lapuerta.[1] He claimed that Lapuerta's negligent treatment of the wound caused the infection, which necessitated the ray amputation. Lapuerta defended his treatment, contending that the initial saw injury precluded any possibility of saving the finger. Lapuerta further alleged that Torres's negligent care for his finger after the accident—poor hygiene, smoking, going on vacation during treatment, and failing to participate in physical therapy—contributed to the finger's deteriorating condition. At trial, the jury heard testimony from Torres, Dr. Lapuerta, Dr. Henry, and medical expert witnesses on both sides.

Several doctors testified about the chances of saving the finger. Dr. Lapuerta testified that the severity of the injury meant there was less than a 10% chance of saving the finger. Dr. Hua, a hand surgeon, testified that there was a 10–20% chance of saving the finger. Torres's expert, plastic and reconstructive surgeon Dr. Robison, offered an essentially identical prognosis—"salvaging the finger as a functional finger [was] 10 percent or less."

The jury was asked one simple question: "Did the negligence, if any, of those named below proximately cause the injury in question?" "[T]hose named below" were Lapuerta and Torres, and the jury

---

[1] Torres brought identical claims against Dr. Lapuerta and his professional association, The Plastic Surgery Institute of Southeast Texas, P.A. The parties make no distinction between these defendants, and we refer to them collectively as Lapuerta or Dr. Lapuerta.

answered no as to both. The verdict was 11–1. Based on this answer, the court initially rendered a take-nothing judgment for Lapuerta.

The present dispute stems primarily from an introductory instruction contained in the jury charge. In addition to routine instructions describing negligence, proximate cause, and other terms, the charge instructed as follows:

> You are instructed that JOSE TORRES' finger must have had a greater that fifty percent (50%) chance of survival if reasonable medical care had been provided on or around July 11, 2016 for the negligence of LEO LAPUERTA, M.D., F.A.C.S. to be a proximate cause of the injury to Jose Torres.

This "loss of chance" instruction was requested by Lapuerta.[2] Torres filed written objections to the instruction. The objections were that the instruction should not be included because "(1) the defendant did not plead it, (2) the case was not tried on that theory, . . . (3) the jury questions do not rely on it," and (4) under the Pattern Jury Charges, such an instruction should only be given in cases of the plaintiff's death or impending death. The court overruled the objections and submitted the instruction to the jury.

During deliberations, the jury sent out the following question: "Does the charge relate to the whole finger or partial finger?" Counsel for Torres said, "The whole—I think that's what the charge—the

---

[2] *See Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 859–60 (Tex. 2009) (providing text of similar instruction and explaining that such a "loss of chance" instruction reflects "standards [that] bar recovery by a patient if a condition preexists the negligence of a health care provider and at the time of the negligence, the condition resulted in the patient having a 50% or less chance of cure or survival").

4

definition is asking for, the whole. The whole finger." Counsel for Lapuerta advised, "I don't think the Court can respond to that." The court advised the jury as follows: "The Court, under the law, is not permitted to answer the question that you have presented. Please refer to and follow the instructions already given to you and continue in your deliberations."

After the verdict and judgment in Lapuerta's favor, Torres moved for a new trial. The motion restated Torres's objections to the loss of chance instruction. It also asserted that the instruction had probably resulted in the rendition of an improper judgment by causing jury confusion on a critical issue. *See* TEX. R. APP. P. 44.1(a)(1), 61.1(a). The motion attached a letter the lone dissenting juror sent to Lapuerta, with a copy to Torres's counsel, after the trial. The letter offered a detailed view of the trial from the juror's eyes. He recounted his own medical journey through three surgeries for facial lacerations, hip resurfacing, and an elbow infection. He stated that his own experiences did not allow him to "come to terms with" Lapuerta's treatment of Torres. He questioned whether Torres was "made fully aware of partial amputation as an option." He then described the jury deliberations as follows:

> Lastly, I don't know how much the other jurors shared with you re the deliberation, but in my opinion, there wasn't any. The charge was basically structured as "was the conduct responsible for >50% probability for the loss of the finger." We deliberated on whether this meant the entire finger "or portion thereof." Our request to the court for clarification resulted in the answer: "that is for you to decide." Eleven jurors chose this to mean the entire finger, I chose "the finger *or portion thereof.*" These three missing words made the previous three day trial irrelevant.

5

There was unanimous agreement there was not a >50% chance the entire finger could be saved. The foreman called for a vote, and we were done in minutes. My only option to express my objection was to refuse to sign the agreement.

Lapuerta responded to the motion for new trial. The district court held a hearing and signed a one-sentence order granting the motion. Lapuerta sought mandamus relief in the court of appeals. Among other grounds for relief, he complained that the district court had not given any reasons for granting the new trial. The district court promptly signed an amended order providing seven reasons. The court of appeals dismissed the first mandamus petition as moot. 2023 WL 5963228 (Tex. App.—Houston [1st Dist.] Sept. 14, 2023). Lapuerta filed a second mandamus petition challenging the amended order. The court of appeals denied relief without analysis, 719 S.W.3d 595 (Tex. App.— Houston [1st Dist.] 2024), prompting the mandamus petition now before this Court.

## II.

A writ of mandamus is available to correct a clear abuse of discretion for which there is no adequate remedy by appeal. *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 135–36 (Tex. 2004). In general, there is no adequate remedy by appeal when a court erroneously orders a new trial. *Rudolph*, 674 S.W.3d at 298 n.5. "Accordingly, the only question here is whether the challenged new-trial order was an abuse of discretion." *Id.* at 299 n.5. A trial court has no discretion in determining questions of law or applying the law to the facts. *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992). "Thus, a clear failure by the trial court to analyze or apply the law correctly will

6

constitute an abuse of discretion, and may result in appellate reversal by extraordinary writ." *Id.*

We have often held that mandamus relief is available when a trial court abuses its discretion by granting a new trial on legally improper grounds.[3] The Court's modern jurisprudence on this subject begins with *In re Columbia Medical Center of Las Colinas, Subsidiary, L.P.*, 290 S.W.3d 204 (Tex. 2009). While noting that "trial courts have historically been afforded broad discretion in granting new trials," *id.* at 210, we held that mandamus relief is available where a court grants a new trial without offering sufficiently specific reasons for doing so, *id.* at 206, 212–13. Among the reasons we found mandamus to be an appropriate remedy was the significance of the right to a jury trial, which can be impaired when a trial judge disregards a jury verdict. *Id.* at 209. Our more recent decision in *Rudolph* likewise observes that "disregarding a jury's verdict is an unusually serious act that imperils a constitutional value of immense importance—the authority of a jury." 674 S.W.3d at 302.

A mandamus petition allows an appellate court to "review the correctness of the stated reasons for granting a new trial" and to grant relief if the stated reasons "lacked substantive merit." *In re Toyota Motor Sales, U.S.A., Inc.*, 407 S.W.3d 746, 757, 762 (Tex. 2013). The appellate court "may conduct a merits review of the bases for a new trial order" and may grant mandamus relief if the record does not support

---

[3] *See Rudolph*, 674 S.W.3d 289; *In re Davenport*, 522 S.W.3d 452 (Tex. 2017); *In re Bent*, 487 S.W.3d 170 (Tex. 2016); *In re Toyota Motor Sales, U.S.A., Inc.*, 407 S.W.3d 746 (Tex. 2013); *In re United Scaffolding, Inc.*, 377 S.W.3d 685 (Tex. 2012); *Columbia Med. Ctr.*, 290 S.W.2d 204.

7

the trial court's reason for granting the new trial. *Id.* at 749. Put differently, mandamus relief is appropriate when the court's reason for granting a new trial "is predicated on legal error or lacks record support." *Rudolph*, 674 S.W.3d at 302.

## A.

Before turning to the reasons offered by the district court for granting a new trial, we begin with a troubling aspect of this case's history. Among the foundational pillars of the Anglo–American legal tradition is "the cardinal principle that the deliberations of the jury shall remain private and secret." *United States v. Olano*, 507 U.S. 725, 737 (1993) (citation modified) (quoting *United States v. Va. Erection Corp.*, 335 F.2d 868, 872 (4th Cir. 1964)). For obvious reasons:

> A juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict concerning his mental processes in connection therewith, except that a juror may testify whether any outside influence was improperly brought to bear upon any juror. *Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes.*

TEX. R. CIV. P. 327(b) (emphasis added). The Rules of Evidence reinforce the strict prohibition on post-trial input from jurors:

> During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

8

Tex. R. Evid. 606(b)(1).

Attaching the letter from the dissenting juror to Torres's new trial motion squarely violated these basic rules shielding the contents of jury deliberations from judicial consideration. The fundamental obligation to respect the secrecy of jury deliberations is not binding on Texas judges and lawyers merely because it is restated in the modern rules of civil procedure and evidence. It is instead compelled by the nature and history of the jury system we have inherited. It is binding because it is indispensable to the maintenance and proper functioning of that system—not merely because it is codified in the rules. Neither this dissenting juror's letter nor anything like it has any place in a Texas courtroom.

Fortunately, the district court's new trial order does not rely on the letter. Nor does Torres rely on the dissenting juror's input in this Court. He does, however, rely on a theory of juror confusion that closely tracks the letter's allegations. Given the significant thematic overlap between Torres's arguments for a new trial and the dissenting juror's statements about the jury's deliberations, we cannot ignore the possibility that the juror's improper input is what prompted the new trial motion and ultimately the new trial order. At the very least, that possibility presents itself as a valid inference from this record.

Because the new trial order fails on other grounds—and because Lapuerta does not urge the point—we have no occasion to decide whether the new trial motion's gross violation of the rules against divulgence of jury deliberations required denial of the motion irrespective of its other merits. The use of evidence of this nature to

9

attack a jury verdict is no mere technical violation of the rules. It purposefully undermines the secrecy that is foundational to the jury system. Such evidence may introduce error into the proceedings so fundamental that the party using the evidence must forfeit the relief it requests. Although we could answer that question in a future case, we hope never to have the need.

**B.**

The district court offered seven grounds for granting a new trial. None of them, "taken individually or collectively," *Rudolph*, 674 S.W.3d at 296, amounted to legally defensible grounds for a new trial under these circumstances. The seven grounds were:

1. The Court finds that there was charge error related to the submission of the [loss of chance] instruction.

2. The Court finds the Doctrine of Lost Chance of Survival is not a part of Texas Common Law and has been specifically rejected by the Texas Supreme Court pursuant to *Kramer v. Lewisville Mem'l Hosp.*, 858 S.W.2d 397, 407 (Tex. 1993).

3. The Court finds that while the offered instruction was intended to be an explanation of proximate cause, it improperly referenced a doctrine that has been rejected by the Texas Supreme Court.

4. The Court finds that the instruction probably caused the rendition of an improper judgment based on the sole question asked by the jury in this matter which requested clarification of what the instruction meant when it referenced "the finger."

5. The Court finds that there are no factually analogous cases where such an instruction has been offered.

6. The Court is not persuaded by the defendant's arguments that the Court should use the instruction as it is found in the Pattern Jury Charge Comments but

10

ignore the commentary as to when it is proper to use the instruction.

7. The Court finds that the instruction fundamentally altered the Pattern Jury Charge Causation definition so that the concept of "a" proximate cause versus "the" proximate cause was excluded from jury consideration by implying that there was only one cause of the ultimate amputation in this matter and denying the fact that there can be more than one proximate cause of an injury.

These seven grounds can be divided into four categories, which we address in turn.

## 1.

The first, second, third, and fifth grounds reflect the court's mistaken view that Texas law does not recognize the "lost chance of survival" as a valid principle of liability. To the contrary, it is well settled that if a condition pre-existing the defendant's negligence gave the plaintiff less than a 50% chance of survival, recovery against the defendant is barred. *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 860 (Tex. 2009); *Park Place Hosp. v. Est. of Milo*, 909 S.W.2d 508, 511 (Tex. 1995); *Kramer*, 858 S.W.2d at 400. This rule flows naturally from the preponderance of the evidence standard, under which the plaintiff must prove the defendant's negligence more likely than not caused the plaintiff's injury. *Kramer*, 858 S.W.2d at 400; *see also Milo*, 909 S.W.2d at 511.

Curiously, perhaps this Court's clearest statement of the settled principle of law that governs this very case comes from our decision in *Kramer*, which the new trial order incorrectly portrays as having "specifically rejected" the principle:

11

> [W]here preexisting illnesses or injuries have made a
> patient's chance of avoiding the ultimate harm improbable
> even before the allegedly negligent conduct occurs—*i.e.,* the
> patient would die or suffer impairment anyway—the
> application of . . . traditional causation principles will
> totally bar recovery, even if such negligence has deprived
> the patient of a *chance* of avoiding the harm.

*Kramer*, 858 S.W.2d at 400. Failure to give an instruction to this effect may be harmful because "[i]t asks too much of lay jurors, untrained in the law, to distill the correct Texas legal standard for loss of chance from the general proximate cause instruction given by the trial court." *Hawley*, 284 S.W.3d at 862. Thus, if the evidence of loss of chance is contested, as it was here, *not* giving the instruction may be reversible error; giving it is certainly not grounds for a new trial. *Id.*

*Kramer* held that there is no separate cause of action for loss of chance of survival, 858 S.W.2d at 398, 407, and perhaps the district court misperceived this holding as a rejection of the doctrine altogether. But as the quote above demonstrates, *Kramer* recognized and reinforced the doctrine's continuing validity as a rule of liability in medical negligence cases, which none of our intervening decisions has questioned. Far from abandoning *Kramer*'s statement of the rule, we have at least twice relied on it, including as recently as 2009, for the proposition that there is no liability for negligent medical treatment "that decreases a patient's chance of avoiding death *or other medical conditions* in cases where the adverse result probably would have occurred anyway." *Hawley*, 284 S.W.3d at 860 (emphasis altered); *Milo*, 909 S.W.2d at 511 (emphasis added).

**2.**

The sixth ground offered by the district court refers to the Pattern Jury Charges, which at the time of trial advised that a "loss of chance of survival" instruction is available only in cases involving the patient's death.[4] The court appears to have believed that submitting the charge was error in any non-death case. Retreating from the view that Texas law does not recognize the "loss of chance" doctrine at all, Torres primarily contends in this Court that the doctrine is limited to death cases. Torres is correct that our decisions in *Kramer*, *Milo*, and *Hawley* all involved the patient's death, which is perhaps why the Pattern Jury Charges until recently limited the instruction's application to death cases. *See* STATE BAR OF TEXAS COMMITTEE ON PATTERN JURY CHARGES, TEXAS PATTERN JURY CHARGES: MALPRACTICE, PREMISES & PRODUCTS PJC 50.1 cmt. (2020). But our reasoning in each of those decisions makes clear that, assuming it is appropriate to the particulars of the case, a "loss of chance" instruction is no less available in an injury case than it is in a death case.

The passage quoted above from *Kramer* says this very plainly, as do *Hawley* and *Milo,* which follow *Kramer*. The question is whether "preexisting illnesses or injuries" made "avoiding the *ultimate harm* improbable" such that the patient would have "die[d] *or suffer*[ed] *impairment* anyway." *Kramer*, 858 S.W.2d at 400 (emphasis added).

---

[4] The Pattern Jury Charges "are not themselves the law, and courts must depart from a pattern jury charge when doing so is necessary to accurately state the law or submit a question to the jury." *JNM Express, LLC v. Lozano*, 688 S.W.3d 327, 332 n.14 (Tex. 2024).

13

The question arises regarding "a patient's chance of avoiding death *or other medical conditions.*" *Hawley*, 284 S.W.3d at 860 (emphasis altered); *Milo*, 909 S.W.2d at 511 (emphasis added). In other words, the principle is applicable to the "loss of chance of survival" of a finger just as it is to the "loss of chance of survival" of a person.

This equivalence is not merely dictated by precedent. It is compelled by the same reasoning that would animate a "loss of chance of survival" instruction in a death case (or any other case). As noted above, the doctrine derives from the basic requirement that the plaintiff prove the defendant's negligence more likely than not caused the injury. *Kramer*, 858 S.W.2d at 400. This requirement—and the rules of liability flowing logically from it—does not operate in a categorically different way when the injury results in death rather than a consequence less severe. In either instance, if there is better than a 50% chance that the patient's adverse outcome would have been no better if the doctor were not negligent, it cannot be said that the doctor's negligence more likely than not caused the outcome. In such a case, the preponderance of the evidence standard dictates that the doctor is not liable. *Id.* Texas law recognizes this principle in medical negligence cases, and a jury instruction to this effect, properly tailored to the facts of the case, should generally be given when the nature of the case and the evidence support doing so. The district court erred by concluding otherwise.

**3.**

The district court's fourth justification for its new trial order stated:

> 4. The Court finds that the instruction probably caused the rendition of an improper judgment based on the sole

14

question asked by the jury in this matter which requested clarification of what the instruction meant when it referenced "the finger."

During deliberations, the jury sent out the following question: "Does the charge relate to the whole finger or partial finger?" Apart from the dissenting juror's letter, which can play no role in the analysis, this question—unanswered by the district court—is the record's only indication that confusion about the difference between the whole finger and part of the finger may have affected the verdict. Of course, the mere fact that the jury asked this question cannot, standing alone, support granting a new trial. Jury questions about instructions are common and do not, without much more, justify a decision to throw out the verdict.

Torres argues that the "loss of chance" instruction was flawed because it did not permit the jury to find negligence on the theory that even though there was little or no chance of saving the *whole* finger, Lapuerta's negligence prevented Torres from pursuing a *partial* amputation, which was to him a preferable outcome. Thus, as a fallback to his argument that the "loss of chance" doctrine is entirely inapplicable to this case, Torres contends that the particular "loss of chance" instruction this jury was given lacked sufficient nuance or detail in light of the facts of the case.

This argument tracks the dissenting juror's allegations of confusion and disagreement in the jury room, which Torres disclaims in this Court but which seems to have played no small role in bringing this case to where we find it. Setting that aside, the jury's question does not, on its own, indicate that the jury took one view or another about the difference between saving the whole finger and saving part of it.

15

Perhaps the jury believed it could consider only the chance of saving the whole finger. Perhaps it also considered the chance of saving the partial finger. Neither its question nor its verdict provides any indication one way or another. Only in the improper juror letter, which cannot be considered, do we find an indication that the jury settled on considering only the whole finger's chance of survival.

When the court consulted counsel for both sides about the jury's question, Torres's counsel responded, "The whole—I think that's what the charge—the definition is asking for, the whole. The whole finger." Thus, although Torres's theory now is that the jury should have considered the chance of saving part of the finger, at the time of the jury's question his counsel apparently did not appreciate the distinction and did not ask the court to instruct the jury to separately consider the partial finger. Nor did Torres's counsel argue at the charge conference that the instructions should distinguish between the whole finger and the partial finger. He opposed the "loss of chance" instruction altogether, but he never suggested it could be improved or clarified by introducing the distinction he now urges.

In the end, the instruction that was given referenced neither the "whole" finger nor the "partial" finger. It did not foreclose the jury from finding that Lapuerta's negligence prevented the allegedly better outcome of a partial amputation. The jury's question suggests it may have struggled over that issue, but we do not (and should not) know whether it actually did or how any such struggle was resolved within the jury room. Perhaps, had Torres argued for it, the instruction could have been more fine-tuned to fit his theory that the partial finger could

16

have been saved. But the question at this stage is not whether the instructions were perfectly tailored to the particulars of the case—especially in a way never urged by the complaining party. The question is whether the defect in the instructions "probably caused the rendition of an improper judgment." TEX. R. APP. P. 61.1(a); *Bed, Bath & Beyond, Inc. v. Urista*, 211 S.W.3d 753, 757 (Tex. 2006).

In other words, we can assume Torres is correct that an ideal instruction would have distinguished between the whole finger and the partial finger. We can also, for the sake of argument, look past his failure to ask for such a distinction, either at the charge conference or in response to the jury's inquiry. Even then, the question is whether this evidentiary record compels the conclusion that the jury probably would have answered differently if the instructions had explicitly embraced the full finger vs partial finger theory of Lapuerta's liability. It does not.

Torres's expert witness, Dr. Robison, testified that saving part of the finger *might* have been possible and that a partial amputation was arguably, from the patient's perspective, a better outcome. The bulk of the testimony was to the contrary. None of the other medical expert witnesses or treating physicians testified that a partial amputation was ever a viable option. Lapuerta testified that a partial amputation was "very questionable" because the finger had suffered a "very contaminated, nasty wound" and that he had only offered Torres the options of trying to save or amputate the whole finger. The other treating physician, Dr. Henry, performed a ray amputation of the whole finger and offered no testimony that a partial amputation was ever possible. Dr. Conoley, a radiologist, testified that he agreed with

17

Dr. Lapuerta regarding amputation because the severity of the injury meant that the blood supply was so compromised that "restoring function to this finger is nearly zero." Dr. Hua, a hand surgeon, testified that at the time of Lapuerta's first surgery on Torres's hand there was a 10–20% chance that the finger could be saved. Dr. Rensimer, an infectious disease and internal medicine specialist, testified that "it was clear from day one that the patient was going to lose this finger." He explained that the initial injury caused an impairment to the blood supply and "the entire outcome of the finger was related to" this "irreversible circulatory compromise." In sum, none of the other five doctors from whom the jury heard vouched for Robison's view that a partial amputation was, at any time, potentially a viable outcome.

The jury also heard evidence that, as the treatment unfolded, Torres would not have approved of a partial amputation even if such a procedure was medically possible. Dr. Lapuerta repeatedly testified that Torres "refused any type of amputation," that he "was totally absolutely against any amputation of any body part," and that he "was not interested in amputation, partial amputations or ray amputation at any time during my treatment." Torres testified that during his treatment by Lapuerta the option of a partial amputation never came up. There was also extensive evidence of Torres's failure to care for the wound and keep it clean, as he was instructed to do, so as to maximize his chances of saving some or all of the finger.

The jury thus had ample evidentiary basis to reach the result it reached, irrespective of any distinction between the whole finger and the partial finger. As Torres's counsel conceded at oral argument, even a

18

differently instructed "jury very well could have found that Dr. Lapuerta was not negligent." A new trial is "a last resort" where "a jury has clearly departed from its function as a rational factfinder." *Rudolph*, 674 S.W.3d at 305. This record provides no basis to conclude that "no rational jury could have exercised its discretion as this jury did." *Id.* The district court therefore erred by concluding that failure to give a more nuanced instruction "probably caused the rendition of an improper judgment." TEX. R. APP. P. 61.1(a).

**4.**

Finally, the seventh ground for the new trial order stated:

> 7. The Court finds that the instruction fundamentally altered the Pattern Jury Charge Causation definition so that the concept of "a" proximate cause versus "the" proximate cause was excluded from jury consideration by implying that there was only one cause of the ultimate amputation in this matter and denying the fact that there can be more than one proximate cause of an injury.

Reliance on this ground was error. Of course, an injury may have more than one proximate cause. *Werner Enters. v. Blake*, 719 S.W.3d 525, 534–35 (Tex. 2025). The "loss of chance" instruction given to the jury neither stated nor implied otherwise. To the contrary, the instruction states that Lapuerta's negligence cannot "be *a* proximate cause of the injury" unless the finger had a greater than 50% chance of survival. The charge further reinforced the law of proximate cause by correctly stating, at the end of the separate instruction on "ordinary care," that "[t]here may be more than one proximate cause of an event." As best we can tell, this ground reflects Torres's position that the "loss of chance" doctrine is altogether faulty—a proposition rejected by our

19

precedent and by our reasoning above. *Supra* Part II.B.1. This ground provides no support for the new trial order.

### III.

Like any party, Torres was entitled to a fair trial, not a perfect trial. The record indicates that he received one. None of the reasons given by the district court, singularly or in combination, provide valid grounds for ordering a new trial.

The petition for writ of mandamus is conditionally granted. The district court is directed to vacate its order granting a new trial and to render judgment based on the jury's verdict. We are confident the court will comply, and the writ will issue only if it does not.

James D. Blacklock
Chief Justice

**OPINION DELIVERED:** April 10, 2026